## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**No.** 1:22-mj-02188 Damian

**UNITED STATES OF AMERICA**

**vs.**

**GALINA ROZENBERG**
      **a/k/a "Galina Shevchenko", and**

**MICHAEL ROZENBERG**

_____/

FILED BY____ER____D.C.

Feb 7, 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

## <u>CRIMINAL COVER SHEET</u>

1.    Did this matter originate from a matter pending in the Central Region of the United Sates Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?    Yes   X No

2.    Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?  Yes   X No

3.    Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?   Yes  X  No

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

By:    /s/ Patrick Queenan
           Patrick Queenan
           Trial Attorney
           FL Special Bar No. A5502715
           U.S. Department of Justice
           Criminal Division, Fraud Section
           Cell: (202) 875-0326
           patrick.queenan@usdoj.gov

AO 91 (Rev. 08/09)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Galina Rozenberg a/k/a Galina Shevchenko, and<br>Michael Rozenberg | ) Case No. 1:22-mj-02188 Damian |
| | ) |
| _____ | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of    October 1, 2020 to July 31, 2021    in the county of    Miami-Dade    in the

Southern    District of    Florida    , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to commit health care fraud |
| 18 U.S.C. § 1956(h) | Conspiracy to commit money laundering |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

/S
*Complainant's signature*

Tony Senat. SA - OIG-HHS
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by FaceTime

Date:    02/07/2022  at 9:35am

*Judge's signature*

City and state:    Miami, Florida

Honorable Melissa Damian U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Tony Senat, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Department of Health and Human Services, Office of Inspector General (HHS-OIG), Miami Regional Office.  I have been employed in this capacity for over five years.  I am presently assigned to investigate a wide variety of health care fraud matters, including schemes to defraud Medicare and Medicaid.  In this capacity, I am authorized to conduct investigations into criminal violations committed against the United States, including, but not limited to health care fraud, payment and receipt of illegal health care kickbacks, making false statements in connection with a health care benefit program, money laundering, and related conspiracies.  I am authorized to apply for and execute arrest warrants for offenses enumerated in Titles 18 and 42 of the United States Code, and to execute search warrants.  I have received extensive training in investigations of fraud related to the United States health care system.

2.      I am personally involved in this investigation along with other federal agents.  The statements contained in this affidavit are based upon a review of both public and private records and interviews conducted by me and other federal agents of witnesses knowledgeable about the facts underlying this investigation.

3.      This Affidavit is submitted for the limited purpose of establishing probable cause that Defendants **GALINA ROZENBERG** a/k/a GALINA SHEVCHENKO ("**G-ROZENBERG**") and **MICHAEL ROZENBERG** ("**M-ROZENBERG**"):

      a. did knowingly and willfully combine, conspire, confederate, and agree with each other and others, in violation of Title 18, United States Code, Section 1349, to:

            i. commit health care fraud, that is, knowingly and willfully execute a scheme

and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title l8, United States Code, Section 1347; and

ii.   commit wire fraud, that is, knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343; and

b.   did willfully, that is, with the intent to further the objects of the conspiracy, knowingly, combine, conspire, and agree with each other and others, to violate Title 18, United States Code, Section 1956(a)(1)(B)(i), that is, to conduct a financial transaction affecting interstate and foreign commerce, which transaction involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed in whole or in part to conceal and disguise the nature,

3

location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(h).  It is further alleged that the specified unlawful activity is conspiracy to commit health care fraud and wire fraud, in violation of Title 18, United States Code, Section 1349.

4.      The facts contained in this Affidavit are based on my personal knowledge and observations, as well as facts relayed to me by other law enforcement officers, witnesses, and documents.  This Affidavit does not contain all the facts of this investigation known to me or to other law enforcement personnel.  Rather, it sets forth only those facts sufficient to establish probable cause in support of a criminal complaint charging **G-ROZENBERG** and **M-ROZENBERG** with conspiracy to commit health care fraud and wire fraud, in violation of Title 18, United States Code, Section 1349, and conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h).

### The Medicare Program

5.      The Medicare Program ("Medicare") is a federally funded program that provides free and below-cost health care benefits to people age 65 years or older, the blind, and the disabled. The Centers for Medicare & Medicaid Services ("CMS") is responsible for the administration of Medicare

6.      Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."  Beneficiaries are eligible to receive a variety of services, including hospital services ("Part A"), physician services ("Part B"), and prescription drug coverage ("Part D").  Part B covers outpatient physician services, such as office visits, minor surgical procedures, and laboratory services, such as drug testing and genetic testing, when certain criteria are met.

7.      "Providers" include independent clinical laboratories, physicians, durable medical equipment companies, and other health care providers who provide services or items to beneficiaries.

To bill Medicare, a provider must submit a Medicare Enrollment Application Form CMS-855 ("Provider Enrollment Application") to Medicare. The Provider Enrollment Application contains certification statements that the provider must agree to before enrolling with Medicare. Specifically, the certification statement sets forth, in part, that the provider agrees to abide by the Medicare laws, regulations, and program instructions, including the Federal anti-kickback statute, and will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

8.       Also, Medicare will not pay claims procured through the payment of kickbacks.

9.       A Medicare "provider number" is assigned to a provider upon approval of the Provider Enrollment Application. A provider may use that provider number to file claims with, or "bill" Medicare to obtain reimbursement for services rendered to beneficiaries. When submitting claims to Medicare for reimbursement, providers certify that: (1) the contents of the forms are true, correct, and complete; (2) the forms are prepared in compliance with the laws and regulations governing Medicare; and (3) the services purportedly provided, as set forth in the claims, are medically necessary.

10.      Medicare, in receiving and adjudicating claims, acts through fiscal intermediaries called Medicare administrative contractors ("MACs"), which are statutory agents of CMS for Medicare Part B. The MACs are private entities that review claims and make payments to providers for services rendered to beneficiaries. The MACs are responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim is for a covered service.

11.      Additionally, when initially enrolling or updating ownership or management information, the Provider Enrollment Application requires that the provider disclose all owners and any individuals or businesses with managing control over the provider. This includes any individual

or entity with 5 percent or more ownership, managing control, or a partnership interest regardless of the percentage of ownership the partner has.

12.     This disclosure requirement is necessary, in part, because, under Title 42, Code of Federal Regulations, Section 424.530, CMS may deny a provider's enrollment in the Medicare program for, among other reasons, if the "provider, supplier, or any owner or managing employee of the provider or supplier was, within the preceding 10 years, convicted . . . of a Federal or State felony offense that CMS determines is detrimental to the best interests of the Medicare program and its beneficiaries."

**Medicare Coverage for Cardiovascular Testing**

13.     This investigation concerns claims submitted to Medicare for Part B laboratory services, namely, cardiovascular genetic testing (referred to herein as "cardio testing" or "cardio tests"). Cardio tests use DNA sequencing to detect mutations in genes that can indicate an increased risk of developing serious cardiovascular conditions in the future and can assist in the treatment or management of a patient who presently has signs or symptoms of a cardiovascular disease or condition. The tests are not a diagnostic tool to identify a cardiac condition in the first instance.

14.     For this type of testing, the patient provides a cheek or nasal swab containing DNA material. Tests can be run on different "panels" of genes. Genetic testing typically involves multiple lab procedures that can result in billing Medicare using certain billing codes, each with their own reimbursement rate. Medicare reimburses for the cardio test at rates varying from approximately a few hundred dollars to over $7,000 for a panel of tests.

15.     Congress statutorily excludes Medicare from covering diagnostic testing that is "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory

exceptions, Medicare does not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1). Among the statutory exceptions Medicare covered are cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

16.     If diagnostic testing is necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposes additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provides, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

17.     Because cardio testing does not diagnose cardiovascular diseases or conditions, Medicare only covers such tests in limited circumstances, such as when a beneficiary experiences sudden cardiac death, is revived, and the sudden cardiac death is resultant of a genetic anomaly. In this rare occurrence, the immediate first-degree family members of the surviving patient may be candidates for cardio testing to screen for genetic mutations.

18.     Medicare does not pay for cardio tests merely because a patient had hypertension or a history of cardiovascular conditions.

### Statutory Limits on References Labs

19.     Federal law limits the amount of testing of any kind that an independent clinical laboratory can bill Medicare for when it does not perform the test itself. Labs that lack the capacity

or equipment to perform all the tests referred to it by providers may "reference out" some tests to another lab.  Apart from two circumstances that do not apply here, a lab may not reference out more than 30% of its tests and still bill Medicare for those tests.  42 U.S.C. § 1395l(h)(5)(A).  This is known as the "Shell Lab Rule," as it prevents laboratories from acting as mere billing shells while performing little, or none, of the work themselves.

## THE DEFENDANT AND RELATED INDIVIDUALS AND ENTITIES

20.     PROGENIX is a limited liability company formed under the laws of Florida with a principal place of business at 19580 W Dixie Highway, Suite 306, North Miami Beach, Florida. PROGENIX is enrolled in Medicare as an independent clinical laboratory, with a practice location of 33300 Egypt Lane, Suite F200, Magnolia, Texas.  As described in detail below, there is probable cause to believe that PROGENIX is a shell laboratory controlled by **G-ROZENBERG**, **M-ROZENBERG**, and other conspirators.  From in or around November 2020, through in or around July 2021, PROGENIX billed Medicare approximately $32,597,762.35, of which Medicare paid PROGENIX approximately $25,640,384.51.

21.     **G-ROZENBERG** (DOB: 2/23/1983) was born in Russia with the maiden name of Galina Shevchenko.  **G-ROZENBERG** is a dual citizen of Russia and the United States  Upon information and belief, **G-ROZENBERG** changed her name to Galina Rozenberg following her marriage to **M-ROZENBERG**.  **G-ROZENBERG** is a resident of Broward County, Florida, and is a listed corporate agent and owner of PROGENIX.

22.     **M-ROZENBERG** (DOB: 9/11/1963) was born in Ukraine. **M-ROZENBERG** is a citizen of the United States.  **M-ROZENBERG** is married to **G-ROZENBERG**, and **M-ROZENBERG** is the beneficial owner of PROGENIX.

8

23.     DMC Group Holding, LLC ("DMC GROUP") is a limited liability company formed under the laws of Florida, with a principal place of business at 1200 North Federal Highway, Suite 417, Boca Raton, Florida.

24.     Olympus First Consulting, LLC ("OLYMPUS") is a limited liability company formed under the laws of Florida.

25.     Gentec Solutions, LLC ("GENTEC") is a limited liability company formed under the laws of Florida with a principal place of business at 1200 North Federal Highway, Boca Raton, Florida.

26.     MDA Consumers, Inc. ("MDA CONSUMERS") is a corporation formed under the laws of Florida with a principal place of business at 19632 Backnine Drive, Boca Raton, Florida. According to records on file with the Florida Secretary of State, DANIEL M. CARVER ("D-CARVER") is the sole officer of MDA CONSUMERS.  As discussed below, there is probable cause to believe MDA CONSUMERS is a shell company the co-conspirators used to launder funds from the fraud and kickback scheme primarily to D-CARVER.

27.     H Town Group, LLC ("H TOWN") is a limited liability company formed under the laws of Florida with a principal place of business at 19580 S Dixie Highway, Suite 306, North Miami Beach, Florida.  According to records on file with the Florida Secretary of State, **G-ROZENBERG** and **M-ROZENBERG** are the listed officers.  As discussed below, there is probable cause to believe H TOWN is a shell company the co-conspirators used to launder funds from the fraud and kickback scheme primarily to **G-ROZENBERG** and **M-ROZENBERG**.

28.     Eighteen Group, Inc. ("EIGHTEEN GROUP") is a corporation formed under the laws of Florida with a principal place of business at 1040 Satinleaf Street, Hollywood, Florida.  According to records on file with the Florida Secretary of State, **G-ROZENBERG** and **M-ROZENBERG** are

the listed officers.  As discussed below, there is probable cause to believe EIGHTEEN GROUP is a shell company the co-conspirators used to launder funds from the fraud and kickback scheme primarily to **G-ROZENBERG** and **M-ROZENBERG**.

29.     D-CARVER, a resident of Palm Beach County, Florida, is a convicted felon and an organizer and manager of this conspiracy.  As detailed below, there is probable cause to believe that the **G-ROZENBERG** and others concealed D-CARVER's ownership or managing control over at least three independent clinical laboratories enrolled with Medicare, to include PROGENIX.  Due to his prior felony convictions, had Medicare been informed that D-CARVER was an owner or had managing control over the laboratories, Medicare may have denied enrollment to that provider.

30.     THOMAS DOUGHERTY ("DOUGHERTY"), a resident of Palm Beach County, Florida, is a convicted felon and an organizer and manager of the conspiracy.  As detailed below, there is probable cause to believe that **G-ROZENBERG** and others concealed DOUGHERTY's ownership or managing control over at least two independent clinical laboratories enrolled with Medicare, to include PROGENIX.  Due to his prior felony conviction, had Medicare been informed that DOUGHERTY was an owner or had managing control over the laboratories, Medicare may have denied enrollment to that provider.

31.     JOHN PAUL GOSNEY ("GOSNEY"), a resident of Palm Beach County, Florida, is a beneficial owner of PROGENIX.  As detailed below, there is probable cause to believe that **G-ROZENBERG** and others concealed GOSNEY's ownership or managing control over at least two independent clinical laboratories enrolled with Medicare, to include PROGENIX.

## **PROBABLE CAUSE**

32.     As outlined in greater detail below, there is probable cause to believe that **G-ROZENBERG** and **M-ROZENBERG**, along with CARVER, DOUGHERTY, GOSNEY, and

others (collectively "the Conspirators") conspired to commit health care fraud and wire fraud, and conspired to commit money laundering.  From in or around October 2020, through in or around June 2021, **G-ROZENBERG**, **M-ROZENBERG**, and others caused the submission of over $31 million in false and fraudulent claims to Medicare for expensive and medically unnecessary cardio tests, of which over $25 million was paid.  **G-ROZENBERG**, **M-ROZENBERG**, and others then laundered funds through shell companies in an effort to conceal the nature, location, source, ownership, or control of the proceeds.

33.     The Conspirators owned and operated a telemarketing call center located at 1200 North Federal Highway, Boca Raton, which employed between 50–70 people.[1]  The operations at the call center resulted in the referrals of over 6,000 false and fraudulent cardio tests to laboratories through an aggressive telemarketing campaign, in which telemarketers lied to and deceived Medicare beneficiaries, of which over 3,600 were referred to PROGENIX.  Additionally, these Conspirators also owned and controlled laboratories that billed Medicare, including PROGENIX.  There is also probable cause to believe that in obtaining enrollment with Medicare for PROGENIX, the Conspirators initially concealed **M-ROZENBERG's,** D-CARVER's, DOUGHERTY's, and GOSNEY's ownership and managing control.  There is probable cause to believe that PROGENIX did not actually render any clinical diagnostic laboratory services, but instead referenced out the services to a separate laboratory for each of the over- 3,600 cardio tests PROGENIX billed to Medicare.  For each cardio test, the Conspirators paid that reference lab a few hundred dollars to run the test.  The Conspirators then billed Medicare over $7,000 for each test.  Because they owned and

---

[1] On July 13, 2021, the Honorable Magistrate Judge Shaniek Maynard approved a Search and Seizure Warrant of 1200 North Federal Highway, Suite 417, Boca Raton, Florida. On July 14, 2021, federal agents executed the warrant and seized evidence related to these conspiracies.  Additionally, on December 3, 2021, the Honorable Judge William Matthewman approved a Search and Seizure Warrant related to nine email accounts controlled by Google, LLC, including **G-ROZENBERG**'s email account (g.rozenberg305@gmail.com) and **M-ROZENBERG**'s email account (m.rozenberg305@gmail.com).

controlled laboratories—to include PROGENIX—the Conspirators retained the entire reimbursement from Medicare—after they paid out the overhead costs for operating the scheme.

34.     As a result, there is probable cause to believe that, in merely a six-month period, D-CARVER, DOUGHERTY, GOSNEY, **G-ROZENBERG**, and **M-ROZENBERG** each received millions of dollars in traceable fraud proceeds flowing through PROGENIX.

<u>Background and Creation of PROGENIX</u>

35.     CS-1 is a convicted felon with convictions for drug trafficking as well as assault charges.  CS-1 is cooperating with the government in the hopes of receiving substantial assistance credit to reduce CS-1's sentence.  CS-1 was incarcerated until in or around November 2019, as described below, worked with CARVER and others until March 2021, and, then in March 2021, was incarcerated again

36.     CS-1 told agents that CS-1 is a childhood friend of CARVER's and that, after CS-1's release, CS-1 briefly partnered with D-CARVER in a call center that sold DME prescriptions to other marketers and DME companies.  That venture, however, ended around January 2020.  CS-1 told agents that, at that time, CS-1 was hired to work at Broad Street Lifestyles, LLC ("BROAD STREET"), under D-CARVER and DOUGHERTY's management.  BROAD STREET operated call centers in Broward and Palm Beach Counties, Florida. The call centers conducted telemarketing campaigns directed at Medicare beneficiaries.  BROAD STREET then sold completed doctors' orders for these beneficiaries—most of which were obtained by paying telemedicine companies—for durable medical equipment ("DME") and genetic testing to DME companies, laboratories, and other marketing companies.  At some point, GOSNEY joined the partnership with D-CARVER and DOUGHERTY.

37.     CS-1 further informed agents that, during the operation of BROAD STREET, CARVER, DOUGHERTY, and GOSNEY purchased or acquired laboratories, and then used the laboratories to bill Medicare for the genetic tests generated from BROAD STREET's call center operation.   One of these laboratories was PROGENIX, which CARVER, DOUGHERTY, and GOSNEY opened in Texas.

38.     CS-1 explained to agents that **M-ROZENBERG** and **G-ROZENBERG** invested approximately $100,000 to become owners of PROGENIX.   CS-1 stated that CS-1, CARVER, and **M-ROZENBERG**'s son, Gregory Rozenberg, grew up together.   In December 2019, Gregory Rozenberg was shot and killed.   CS-1 believed that **M-ROZENBERG** and **G-ROZENBERG** were brought in as partners in PROGENIX as a favor from CARVER and because CARVER had a personal relationship with **M-ROZENBERG** and his deceased son.

39.     CS-1 also explained to agents that **G-ROZENBERG, M-ROZENBERG**, CARVER, DOUGHERTY, and GOSNEY were each partners in PROGENIX, with each to receive an "equal split" among the proceeds.

40.     According to corporate records, on or about October 7, 2020, PROGENIX was formed as a limited liability company, and **G-ROZENBERG** was the sole listed manager of PROGENIX.

41.     According to bank records obtained by subpoena, on or about October 23, 2020, **G-ROZENBERG** and **M-ROZENBERG** opened a bank account ending in x1378 in the name of PROGENIX at TD Bank ("TD x1378").   **G-ROZENBERG** and **M-ROZENBERG** were the sole signatories on the account.

42.     According to bank records obtained by subpoena, on or about October 26, 2020, FGL Transport, Inc., a company owned and controlled by **M-ROZENBERG**, wired $50,000 to TD x1378, and, on December 1, 2020, FGL Transport, Inc. wired another $40,000 to TD x1378.

13

43.     According to Medicare enrollment records, on or about December 8, 2020, **G-ROZENBERG** executed CMS-855 Form falsely attesting that she was the sole owner and manager of PROGENIX.  In actuality, **M-ROZENBERG**, CARVER, DOUGHERTY, and GOSNEY were also beneficial owners and managers of PROGENIX.

44.     According to an Investment Agreement executed by CARVER and DOUGHERTY, as of November 12, 2020, CARVER and DOUGHERTY were "a combined fifty (50%) members" in PROGENIX.  Yet, **G-ROZENBERG** did not disclose their ownership interest to Medicare, nor did she disclose **M-ROZENBERG** or GOSNEY's ownership or managing control.

45.     According to bank records obtained by subpoena, **G-ROZENBERG** opened an account in the name of PROGENIX ending in x6648 at SunTrust Bank ("SunTrust x6648").  She was the sole signatory listed on the account.

46.     According to bank records obtained by subpoena, **G-ROZENBERG** and CARVER opened an account in the name of DMC GROUP ending in x6697 at SunTrust Bank (SunTrust x6697").  **G-ROZENBERG** and DOUGHERTY were the signatories on the account and **G-ROZENBERG** was described as the "Secretary" of DMC GROUP.

47.     According to Medicare records, on or about April 12, 2021, **M-ROZENBERG**, DOUGHERTY, and DMC GROUP were added as 5% or more owners on Medicare ownership documentation.

48.     According to Medicare data, from on or about January 22, 2021, and continuing through on or about July 29, 2021 (approximately six months), PROGENIX billed Medicare approximately $31,805,201, of which $25,640,384 was paid.  These claims were related to approximately 3,658 beneficiaries from across the country and were almost exclusively for claims

related to expensive cardiovascular genetic testing. Additionally, Medicare data reflects that PROGENIX referenced all these expensive genetic tests out to a reference lab located in California.

Telemarketing and Doctor Chase Phases

49.     From in or around December 2020, through, at least, July 2021, the Conspirators operated a call center out of 1200 North Federal Highway (the "NORTH FEDERAL CALL CENTER"). On or about June 17 and 22, 2021, agents conducted surveillance of the NORTH FEDERAL CALL CENTER and identified **G-ROZENBERG** and **M-ROZENBERG**'s vehicles parked outside.

50.     Additionally, according to text messages obtained by subpoena, on January 25, 2021, Consultant #1, a consultant who worked with PROGENIX, texted both **G-ROZENBERG** and **M-ROZENBERG**, in pertinent part, "Thanks for your time today. We look forward to continuing to do business together."

51.     Additionally, on March 10, 2021, **G-ROZENBERG** exchanged text messages with Consultant #1 regarding where Consultant #1 should send "some claim mail [that] arrived from novitas [(a Medicare contractor)] at progenix." **G-ROZENBERG** instructed Consultant #1 to "scan it and mail it to me . . . the physical address is 1200 N Federal Hwy Suite 417 Boca Raton, Florida," which was the NORTH FEDERAL CALL CENTER.

52.     Additionally, according to search warrant returns and subpoena returns, both **G-ROZENBERG** and **M-ROZENBERG** received emails from conspirators and others involved in the scheme. For example, on November 30, 2020, Consultant #2, a consultant that partnered with Consultant #1 who worked with PROGENIX, sent an email directed at "Galina / Michael," which contained an outline of the "next steps" related to "Progenix Lab." This outline included "reference agreement," "PTAN application," "shipping supplies," "Progenix co-branding," "Staffing/CLIA

15

required," billing, CMS 116 form submission, genetic counseling, and other aspects of owning and operating an independent clinical laboratory.[2]

53.    Further, on January 11, 2021, Consultant #2 sent an email directed at "Danny, Galina, Michael, and Tom," stating, in pertinent part, "Great to meet with y'all at your office last week to review the current Progenix lab state-of-the-union and discuss plans for 2021."

54.    Also, on January 15, 2021, Consultant #2 emailed **G-ROZENBERG**, **M-ROZENBERG**, CARVER**,** and DOUGHERTY stating, in pertinent part, "Thanks again for extending our partnership to include the NOLA labs."

*Former Call Center Employee*

55.    On or about June 17, 2021, agents spoke to CS-2, a former sales representative that had worked at the NORTH FEDERAL CALL CENTER for a few weeks shortly before the interview. CS-2 produced a copy of a paystub which listed DMC GROUP as his employer.  After the interview, CS-2 informed agents that the call center documents mentioned GENTEC as the entity that was contacting the beneficiaries.

56.    CS-2 was offered a job in the sales department, paid $600 a week, and also had an opportunity to earn cash incentives if he met certain benchmarks.  CS-2 described the NORTH FEDERAL CALL CENTER as having four departments: approximately 20 employees in the sales department; 10 in the insurance verification department; 20 in the transfer department; and CS-2 believed there were additional employees working in a doctor chase department.[3]  According to CS-2, the sales department was responsible for calling Medicare beneficiaries and convincing them to

---

[2] "PTAN" refers to a Provider Transaction Access Number, which is a Medicare-issued number given to providers by Medicare Administrative Contractors upon enrollment with Medicare.  Also, "CLIA" refers to the Clinical Laboratory Improvement Amendments, which operates under CMS to regulate all laboratory testing performed on humans in the U.S.

[3] "Doctor chasing" is the process of the marketing companies faxing or providing the beneficiary's primary care physician with a proposed prescription.  Marketers repeatedly call the doctor's office in an effort to coax the doctor into signing the prescription.

agree to take a cardio test; the insurance verification department verified that the individuals the call center contacted actually had Medicare; and the transfer department transferred patients from one department to another.   CS-2 believed the doctor chase department was responsible for faxing prescriptions for the cardio tests, also known as requisition forms, to beneficiaries' doctors, seeking the doctors' signatures authorizing the cardio tests.   CS-2 did not know how the call center found the doctors, or whether doctor's signatures were ever forged on requisition forms.   However, CS-2 discovered a fax cover sheet that GENTEC sent to doctors, which is described below.

57.   CS-2 told agents s/he worked as a sales representative.   CS-2 described that there were four managers at the NORTH FEDERAL CALL CENTER and that they provided her/him with a binder containing information about cardio testing and scripts to make telemarketing calls to Medicare beneficiaries in an effort to "sell" them cardio tests.   CS-2 provided agents a copy of two of the scripts and explained that two managers explicitly trained him/her and other employees to lie to Medicare beneficiaries during the call if that is what it took to close the "deal."   Below are examples of the lies CS-2 stated were contained in the copy of the calls scripts CS-2 provided to agents:

i.   – *Hello, this is _____ with the health and wellness center . . .* (CS-2 stated there was no health and wellness center);

ii.   - *. . . you and I spoke last year and we did a brief wellness check do you recall that?* (CS-2 explained this was a lie and because many of the beneficiaries were elderly, they would likely not remember either way);

iii.   - *. . . we do the wellness check annually so we are going to take care of that really quick today* (CS-2 explained the purpose of the call was not to conduct an annual wellness check but to induce the beneficiary to provide Medicare and health information and further induce them to consent to a cardio test);

iv.   - *. . . I have most of your information from last year* (CS-2 explained no one spoke to the beneficiary "last year;" instead, the call center had purchased lists of Medicare beneficiaries that contained contact information and sometimes a Medicare insurance number);

v.   – *This is a preventive test provided as a benefit of your insurance.*  (As discussed above, unless the beneficiary meets the strict medical necessity requirements listed above, Medicare does not cover this expensive cardio test for screening or "preventive" purposes).

58.   CS-2 also said her/his managers instructed telemarketers to ask the beneficiary numerous questions to lead the beneficiary to answer in the affirmative to justify the ordering of a cardio test.

59.   CS-2 further explained there was a TV monitor on the sales floor broadcasting to the entire sales department the leaders for the day, week, and month.  The managers used this as a tool to keep the sales department employees motivated.  Additionally, CS-2 explained that, if a sales representative convinced three beneficiaries in a day to consent to a cardio test, that sales representative got a chance to spin a "cash wheel" to receive a cash bonus.

60.   When a Medicare beneficiary did not consent to the test and then asked to be placed on a do-not-call list, CS-2 explained that her/his managers instructed CS-2 not to place the Medicare beneficiary on the do-not-call list because the call center wanted to be able to call that beneficiary during a later telemarketing campaign.

61.   CS-2 also explained that CS-2 was instructed to hang up on anyone that was not a Medicare recipient as her/his managers informed CS-2 they only wanted to sell to Medicare beneficiaries.

62.   CS-2 explained that each sales representative utilized a computer with dual monitors and used applications or software on the computer to conduct sales and gather the Medicare beneficiary information.  Typically, upon making the calls, CS-2 only had name and contact information for the beneficiary, although in a few instances the patient list included the Medicare insurance number.  CS-2 explained that, when s/he had the Medicare number, it made the telemarketing call seem "more legit."  When CS-2 did not have the Medicare number, CS-2 explained

that s/he was instructed by her/his managers to lie to beneficiaries to convince the beneficiaries to provide their Medicare numbers, which was necessary for the labs to bill Medicare. CS-2 explained that s/he was instructed to tell beneficiaries that s/he was already in possession of their Medicare number but it was encrypted, and, to move forward with ordering the genetic test, the beneficiary needed to "confirm" the number.

63.    CS-2 identified D-CARVER and GOSNEY as two of the "top three guys." CS-2 was unable to identify the third "top guy." CS-2 explained that D-CARVER, GOSNEY, and the third "top guy" maintained their own offices within the NORTH FEDERAL CALL CENTER, each with their own computer and dual monitor set up. CS-2 explained that, if there was an issue with a beneficiary during a call, one of the "top three guys" would take over the call as they were "smooth talkers." CS-2 identified GOSNEY as the daily floor manager, who was ranked highest on the management team at the NORTH FEDERAL CALL CENTER. GOSNEY ran the call center and would provide daily morning briefings to the entire sales department.

64.    CS-2 also provided photographs to agents, which s/he took while working at the NORTH FEDERAL CALL CENTER. These photographs included the two call scripts described above, text message threads between CS-2 and managers at the call center, screenshots of the software or applications used by the sales representatives, the money wheel, the computer set up for sales representatives, CS-2's paystub, the fax cover sheet from GENTEC (discussed below), and a screenshot of a requisition form CS-2 found on CS-2's computer at the NORTH FEDERAL CALL CENTER.

65.    CS-2 was not a licensed medical professional of any kind.

***Doctor Chase Faxes and Complaints to Medicare***

66.     As discussed by CS-2, the call center had a doctor chase operation after a "deal" or "sale" was made.

*Fax Example #1 (from call center computer)*

67.     CS-2 informed agents that, while working at the NORTH FEDERAL CALL CENTER, CS-2 came across a copy of the standard fax cover sheet on CS-2's computer.  The fax was purportedly from GENTEC and was directed to a doctor as part of the doctor chase portion of the scheme.  Independently, agents obtained a copy of actual fax cover sheets GENTEC sent to medical providers, which contained the same language.  Below is a photograph of the fax cover sheet CS-2 provided.  The fax falsely and deceptively refers to the beneficiary as "our mutual patient."

*Fax Example #2 (from medical provider)*

68.     On December 8, 2020, PROGENIX submitted claims to Medicare related to a cardio test purportedly performed for J.C.  Medicare paid PROGENIX $7,114.05 for the claims.  Dr. S.M. was the referring provider.

69.     Agents spoke with Dr. S.M. and other hospital personnel, who stated that J.C.'s patient file contained a fax request from GENTEC requesting that Dr. S.M. sign a requisition form for a cardio test.  Dr. S.M. confirmed that s/he signed the requisition form.

70.     Dr. S.M. explained that s/he had been J.C.'s primary care physician since 2014 and, due to J.C.'s age and other conditions, s/he never suggested that J.C. take a cardio test.  However, due to the volume of requests for his/her signature on forms s/he received on a daily basis, s/he was unable to "validate each one of them."  Dr. S.M. explained that a majority of the forms s/he received seem legitimate, and s/he had signed "hundreds of patient requisition forms."  Dr. S.M. did not speak to

any other doctors regarding J.C.'s cardio test and speculated that s/he signed J.C.'s requisition form to appease his/her patient.

71.     Agents also interviewed J.C. and his/her spouse.  Both stated that J.C. never completed a cardio test, never spoke to anyone about a cardio test, and never heard of GENTEC.

***Complaint to Medicare Example***

72.     Additionally, HHS-OIG received a number of complaints from Medicare beneficiaries or doctors involving GENTEC.

73.     On May 26, 2021, Dr. S.P. filed the following complaint:

I am the primary care physician [for P.E.].  On May 25, 2021 I was faxed a form to fill out so that [P.E.] could get a "Genetic Cardiovascular Risk Assessment test".  This came from Genetic Solutions, phone (833)-217-9561.4  I had no idea why she would want this as she is 78 years old and has not had any significant cardiovascular problems.  The ICD-10 codes on the form were prepopulated by the company I49.8 – Other specific cardiac arrhythmias, R06.02 Shortness of breath, Z72.3 – lack of physical exercise, and I42.9 – Cardiomyopathy.  None of these codes applied to [P.E.].  I called [P.E.] and asked her if someone had called her about this.  She said someone who was "associated with Medicare" called and wanted to ask her questions about "her family history."  She said they kept her on the phone for about 30 minutes.  She had no idea that they wanted to do genetic testing which apparently they were going to bill to Medicare.  I feel this is fraudulent activity as what was to be ordered was a battery of about 250 genetic tests in the Comprehensive Cardiovascular NGS panel.  This was never solicited from our office.  [P.E.] also stated she did not request it and did not know this was being requested.

<u>Use of PROGENIX as a Shell Lab to Bill over $31 Million</u>

74.     In addition to the false CMS-855 that **G-ROZENBERG** executed and caused to be submitted to Medicare, **G-ROZENBERG** also represented to Medicare that Dr. Lee Ann Grossberg was the Medical Director for PROGENIX.  On or about August 2, 2021, agents interviewed Dr. Grossberg, who explained that she was hired to work at PROGENIX, which she described as a startup

---

4 This is the same fax number on the GENTEC fax cover sheet provided by CS-2 as well as the other fax cover sheets recovered by agents through witness interviews and hotline complaints filed with HHS-OIG.  As a result, it appears the complainant incorrectly referred to the fax author as "Genetic Solutions," as opposed to GENTEC.

lab. As medical director, Dr. Grossberg was theoretically responsible for overseeing testing results; however, she never oversaw any results at PROGENIX because "everything was being referenced out to" a reference laboratory. In fact, Dr. Grossberg explained that she had never been inside of PROGENIX, that PROGENIX did not have any instruments, and that no other physicians were employed by PROGENIX.

75.     Dr. Grossberg explained that CARVER and **G-ROZENBERG** owned PROGENIX. Dr. Grossberg explained that she received "worrisome phone calls" and complaints from angry doctors inquiring about the cardiovascular genetic tests they were receiving for their patients. The doctors would call Dr. Grossberg asking her why she ordered the genetic tests for their patients, telling her they never requested the tests, and asking how PROGENIX received the doctor's information and the patient's information. Dr. Grossberg forwarded these complaints to CARVER as well as to Consultant #1, a consultant for PROGENIX.

76.     According to emails obtained by subpoena, on January 29, 2021, Consultant #1 forwarded a complaint to **G-ROZENBERG** from a representative of a cardiologist group located in Arizona stating they are "getting requested to sign hereditary cardio orders for their patients by Accugene. She was very upset because their patients are saying that they did not request these tests, and their doctors did not order them."

77.     Accugene, LLC is another independent clinical laboratory that the Conspirators enrolled with Medicare, which listed **G-ROZENBERG** and Josephine Carver, CARVER's mother, as the only owners and managers of the laboratory. Indeed, **G-ROZENBERG** executed and submitted to Medicare a false CMS-855 Form tied to Accugene, LLC.

78.     Consultant #2, spoke to law enforcement under the terms of a proffer agreement. Consultant #2 owned and operated a consulting company involved in the acquisition and creation of

independent clinical laboratories, to include PROGENIX.  Consultant #2 explained that on or about October 28 and 29, 2020, Consultant #2 met with CARVER, DOUGHERTY, **G-ROZENBERG**, and **M-ROZENBERG** in Houston, Texas, to select sites for PROGENIX.  Consultant #2 explained that the site they ultimately selected was "just a room."  Indeed, Consultant #2 confirmed that PROGENIX did not conduct tests, and, instead, referenced the samples to another lab for approximately $400 per test.

79.   The undersigned affiant travelled to Magnolia, Texas and took photographs of PROGENIX's practice location, which contained a microwave, a table, a chair, and no laboratory equipment.

80.   Consultant #2 further explained that **G-ROZENBERG** regularly communicated with him and other members of Consultant #2's consulting team, and that **G-ROZENBERG** was the "day to day" person for PROGENIX.

81.   Consultant #2 also stated that he advised CARVER and **G-ROZENBERG** that PROGENIX was billing panels with 129 genes or more and that they should run only 117-gene panels as the genes on the higher panel were completely unrelated to cardiovascular.  Consultant #2 stated that s/he later called the reference lab that PROGENIX referred all its samples to and changed the processing from 129 genes to 117 genes.  This change only lasted three weeks because CARVER and **G-ROZENBERG** found out and were angry about the $1,200 difference between the two panels, which meant that CARVER's labs lost out on $1,200 for each cardiovascular sample it was referencing.

82.   According to emails obtained by subpoena, on February 4, 2021, **G-ROZENBERG**, CARVER, and others received an email from Consultant #1's husband, also a consultant for PROGENIX, stating, "I've been concerned over the constant swapping of panels based on billing.

There are no off the shelf options that cover all options and the 117 and 129 are not just 12 different genes, there are about 40 genes missing between the two."

83.     CS-3 was hired by **G-ROZENBERG** and another individual to be the general supervisor of PROGENIX.  At an interview with agents, CS-3 explained that **G-ROZENBERG** oversaw the operations at PROGENIX and that **G-ROZENBERG** purchased patient call lists for PROGENIX and the lab used the lists to contact Medicare beneficiaries.  CS-3 also stated that PROGENIX never ran any laboratory tests, and, instead, all samples for PROGENIX were referenced to a separate reference laboratory.

<u>Money Laundering Phase</u>

84.     As mentioned above, according to Medicare, banking and financial records obtained via subpoena, PROGENIX received over $25 million from Medicare tied to the expensive and medically unnecessary claims for cardiovascular genetic testing. **G-ROZENBERG** and **M-ROZENBERG** then laundered fraud proceeds from accounts in the name of PROGENIX to shell companies, such as H TOWN and EIGHTEEN GROUP, which **G-ROZENBERG** and **M-ROZENBERG** owned and controlled.

85.     To conceal CARVER's, DOUGHERTY's, and GOSNEY's ownership of PROGENIX, **G-ROZENBERG** and **M-ROZENBERG** laundered funds from accounts in the name of PROGENIX (TD x1378 and SunTrust x6648) to accounts in the name of OLYMPUS, DMC GROUP, and MDA CONSUMERS, including SunTrust x6697.  From there, CARVER, DOUGHERTY, and GOSNEY conducted further transfers to companies they owned and controlled.

86.     As to DMC GROUP—where **G-ROZENBERG** and DOUGHERTY were the sole signatories on the account: over $2.1 million was transferred to MC Mission, Inc., a shell company owned and controlled by DOUGHERTY; over $1.4 million was transferred to MDA CONSUMERS;

and over $1.4 million was transferred to Metropolis Unlimited, LLC, a shell company owned and controlled by GOSNEY.

87.     Below is a summary of the flow of funds from Medicare through PROGENIX and onto the shell companies and other entities owned and controlled by **G-ROZENBERG, M-ROZENBERG**, CARVER, DOUGHERTY, and GOSNEY.

| From | To | Amount |
|------|-----|--------|
| Medicare | PROGENIX | $25,640,384 |
| PROGENIX | OLYMPUS/DMC GROUP | $8,946,530 |
| PROGENIX | H TOWN | $4,374,100 |
| H TOWN | EIGHTEEN GROUP | $2,380,453 |
| H TOWN | MICHAEL ROZENBERG | $1,164,500 |

88.     In sum, **G-ROZENBERG** and **M-ROZENBERG** transferred at least $4,374,100 in fraud proceeds from accounts in the name of PROGENIX to accounts owned or controlled by **G-ROZENBERG** and/or **M-ROZENBERG**.[5]

<u>Evidence of Flight</u>

89.     Last week, the Department of Justice, Criminal Division, Fraud Section ("Fraud Section") received separate phone calls from lawyers representing **G-ROZENBERG** and **M-ROZENBERG**.  During the contact (which included a call with **M-ROZENBERG**'s lawyer on February 5, 2022), the Fraud Section informed each attorney that their respective clients remained targets of the criminal investigation and that it was likely that the Fraud Section would recommend charging each—**G-ROZENBERG** and **M-ROZENBERG**—with health care fraud and money laundering offenses.

---

[5] On July 13, 2021, the Honorable Magistrate Judge Jacqueline Becerra issued a seizure warrant to seize funds in certain accounts, to include an account at JP Morgan Chase in the name of EIGHTEEN GROUP, which **M-ROZENBERG** was a signatory.  On July 14, 2021, the government seized over $2.1 million from the EIGHTEEN GROUP account.

90.     On or about February 6, 2022, agents were notified by the National Targeting Center that **M-ROZENBERG** and **G-ROZENBERG** booked a flight from Miami International Airport to Moscow, Russia, scheduled to depart on or about 1:55 p.m. on Sunday, February 7, 2022.  According to the manifest, **G-ROZENBERG** booked her flight under her maiden name, Galina Shevchenko and is set to travel under her Russian Passport number.

[THIS SPACE INTENTIONALLY LEFT BLANK]

## CONCLUSION

91.     Based on the foregoing, I respectfully submit that there is probable cause to believe

that **G-ROZENBERG** and **M-ROZENBERG** have each conspired to commit health care fraud and

wire fraud, in violation of Title 18, United States Code, Section 1349, and conspired to launder

monetary instruments, in violation of Title 18, United States Code, Section 1956(h).

FURTHER YOUR AFFIANT SAYETH NAUGHT.

/s

Tony Senat
Special Agent
Dep't of Health and Human Services—OIG

Attested to in accordance with the requirements
of *Fed. R. Crim. P. 4.1* by FaceTime on
February **7th**, 2022.   **9:35am**

THE HONORABLE MELISSA DAMIAN
UNITED STATES MAGISTRATE JUDGE